**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**DELAWARE VALLEY FISH COMPANY**

**CIVIL ACTION**

**VERSUS**

**NO. 21-141-JWD-EWD**

**3SOUTH LLC, ET AL.**

<u>**RULING AND ORDER**</u>

This matter comes before the Court on two related motions.  The first is the *Motion for Partial Summary Judgment* (Doc. 39) ("*MPSJ*") filed by plaintiff, Delaware Valley Fish Company ("Plaintiff" or "Delaware Valley").  The second is Plaintiff's *Motion in Limine to Preclude Parol Evidence* (Doc. 67) ("*MIL*").  Defendants, 3South, L.L.C. and Charlotte Johnston (collectively, "Defendants" or "3South"), oppose the first motion, (Doc. 47), which encompasses an opposition to the second.  Delaware Valley has filed a reply. (Doc. 50.)  Oral argument is not necessary.  The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.  For the following reasons, both motions are denied.

I.    RELEVANT BACKGROUND

A.  Introduction

This is a breach of contract case.  In sum, Delaware Valley claims that it entered into a contract with 3South under which Delaware Valley would supply 100,000 KN95 masks to 3South in exchange for $325,000. (*Delaware Valley['s] . . . Statement of Material Facts in Supp. of*

*[MPSJ] ("SMF")* ¶ 1, Doc. 39-2; 3South's *Response* to *SMF* ("*RSMF*")[1] ¶ 1, Doc. 47 at 2.)[2]  The

transaction was reflected in the following Purchase Order:

**3south, LLC**
3175 Conway Drive
Baton Rouge, LA  70809
5048581955
charlotte@3southcompanie
s.com
www.3southcompanies.com

3 | 3south

## Purchase Order

| VENDOR | SHIP TO | |
|---|---|---|
| Barry Kratchman | DELIVERY TBD | P.O. NO. 0420-DVFCO-KN95 |
| Delaware Valley Fish Company | 3south, LLC | DATE 04/24/2020 |
| 108 West Basin Street | 3175 Conway Drive | |
| Norristown, PA  19401 | Baton Rouge, LA  70809 US | |

| PRODUCT # | PRODUCT # | QTY | PRICE | AMOUNT |
|---|---|---|---|---|
| Respiratory:KN95 DVFC, 50/BX, 16 BX/CS, 16 CS/PALLET, 12,800 MASKS, 167KN95-DVFCO-100K | KN95 DVFC, 20/BX, 30 BX/CS | 100,000 | 3.25 | 325,000.00 |

| PAYMENT will be made after inspection and approval of mask deliveries. | TOTAL | $325,000.00 |
|---|---|---|

Approved By _____

Date _____

(*Purchase Order*, Doc. 35-1; *see also SMF* ¶ 1, Doc. 39-2; *RSMF* ¶ 1, Doc. 47 at 2.)

The central dispute in this case is whether Delaware Valley was required to provide masks

that were FDA and EUA certified.  Delaware Valley claims that it was not. According to Delaware

---

[1] 3South's *RSMF* is contained in its *Opposition*. (*See* Doc. 47 at 2–6.)
[2] When the *SMF* and *RSMF* are cited together in this ruling, the fact was either admitted by 3South or qualified in such a way as to make the stated fact deemed admitted. *See* M.D. La. Civ. R. 56(f) ("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted.").

Valley, the Purchase Order was clear and unambiguous and contained no such term. Thus, says Delaware Valley, 3South is liable for its failure to pay.

Conversely, 3South claims that the masks had to be FDA and EUA approved and that, because the masks were not, 3South was and is not obligated to pay. 3South argues that the parties simply never reached an agreement about the thing sold, that the Purchase Order is ambiguous on this point, and/or that consent was vitiated through error or fraud.

### B. Negotiation of the Purchase Order

As early as March 31, 2020, the owner of Delaware Valley, Barry Kratchman, was referring to the masks as being certified by the FDA. (Kratchman Dep. Ex. 5, Doc. 47-2 at 2–6.) On April 1, 2020, Kratchman forwarded the same test results to a sales consultant, John Coppolino of JAB Holdings, LLC, with the subject of the email being "FDA." (Kratchman Dep. Ex. 6, Doc. 47-2 at 8–10; *see also SMF* ¶ 2, Doc. 39-2; *RSMF* ¶ 2, Doc. 47 at 3.)

Delaware Valley was introduced to 3South by Coppolino, who had been working with 3South on unrelated matters. (*SMF* ¶ 2, Doc. 39-2; *RSMF* ¶ 2, Doc. 47 at 3.) Mary Charlotte Johnston, 3South's sole member, testified that Coppolino was acting as Delaware Valley's agent and broker. (Johnston Dep. 91:7–20, 94:4–13, Doc. 47-1.) According to Johnston, 3South had multiple telephone calls with Delaware Valley and Coppolino after their initial introduction. (*See id.* at 140:9–14, 145:4–12, 153:1–7.)

Because of its existing business relationships in China, Delaware Valley was introduced to a factory that produced the KN95 masks that it contends 3South agreed to purchase. (*SMF* ¶ 3, Doc. 39-2; *RSMF* ¶ 3, Doc. 47 at 3.)

Coppolino hoped to broker a deal between Delaware Valley and 3South and would have been compensated by Delaware Valley. (*See* Coppolino Dep. 32–36, 42:1–43:7, 59:2–15, Doc. 47-

3; Coppolino Dep., Ex. 1, Doc. 47-3 at 17.)  Coppolino answered questions and provided 3South

with information regarding the masks available for purchase. (Johnston Dep. 104:18–105:4, Doc.

47-1; Johnston Dep., Ex. P-7, Doc. 47-1 at 51–52; Coppolino Dep. 41:2–14, Doc. 47-3.)

With twenty-five years of experience in Personal Protective Equipment, and after viewing

a "burn test" of the KN95 masks, Ms. Johnston requested and received pictures of the KN95 masks

and copies of their certifications. (*SMF* ¶ 4, Doc. 39-2; *RSMF* ¶ 4, Doc. 47 at 3.)  Johnston testified

that she received a sample to touch and feel the masks and perform tests to show that the masks

were not an "easy counterfeit" (though the masks could still be fake). (Johnston Dep. 109:23–

112:12, Doc. 47-1.)  But Johnston also testified that Coppolino said the masks would be on the

approved FDA list, so she was not concerned they would not be. (*Id.* at 113:15–114:23.)

On April 27, 2020, Coppolino told Kratchman of Delaware Valley by email:

> [T]he reason [3South] is willing to pay premium on your product is
> because you are taking the import risk and providing the financing
> for the shipment. She has already stated that she would wire the
> funds upon inspection of the shipment. By inspection, she will be
> certain that the product shipped matches the product specifications
> that you have provided. . . . If these terms re [sic] acceptable then
> you should move forward, if not then you should not take the risk. .
> . . My priority in this endeavor is not to make any profit, although it
> is appreciated. . .

(Coppolino Dep. Ex. 1, Doc. 47-3 at 17.)  Coppolino explained that, by saying Johnston would

pay a "premium," he meant:

> So, the way PPE was working is there was a risk involved in
> bringing PPE in from China into the U.S. So, if you were taking the
> risk and bringing it into China, the buyer would pay more because
> it was already in the states. . . . Whoever took the financial risk and
> the import risk would get a premium for a product.

(Coppolino Dep. 55:14–56:15, Doc. 47-3.)

4

When Johnston told Coppolino that 3South was "not taking the risk" of the mask purchase, Coppolino told her that Kratchman was "gonna' fly'em in; you can go in and inspect and approve, 'em; and *if they're not good, then you don't have to get'em*." (Johnston Dep. 94:14–21, Doc. 47-1 (emphasis added).)  Johnston testified that she understood Coppolino's representations to mean that Delaware Valley "was, essentially, importing, and at risk for the ultimate sale, of the KN95 masks; that that was their risk[.]" (*Id*. at 96:4–17.)

### C.  The Purchase Order and Alleged Agreement

Although 3South was satisfied that the KN95 masks passed the burned test, Delaware Valley would not move forward unless it received a purchase order.  (*See SMF* ¶ 6, Doc. 39-2; *RSMF* ¶ 6, Doc. 47 at 4.)  After viewing the burn test and reviewing the KN95 mask certifications (and, according to 3South, other assurances), on or about April 24 or 25, 2020, 3south prepared and sent its standard Purchase Order, No. 0420-DVFCO-KN95 to Delaware Valley. (*See SMF* ¶ 7, Doc. 39-2; *RSMF* ¶ 7, Doc. 47 at 4.)

As shown above, the Purchase Order contained a description of the goods, the quantity, and the price: 100,000 KN95 masks at $3.25 per mask for a total price of $325,000. (*SMF* ¶ 8, Doc. 39-2; *RSMF* ¶ 8, Doc. 47 at 4.)   Further, again, 3south's Purchase Order also said, "PAYMENT will be made after inspection and approval of mask deliveries." (*SMF* ¶ 9, Doc. 39-2; *RSMF* ¶ 9, Doc. 47 at 4.)

Delaware Valley contends that 3South did not condition the purchase of the KN95 masks upon any FDA approval or Emergency Use Authorizations in the Purchase Order. (*SMF* ¶ 11, Doc. 39-2.)  Delaware Valley bases this in part on Johnston's deposition wherein she said that she could have included that language in the Purchase Order and that it would have been a good idea to do so. (Johnson Dep 12:14–13:21, Doc. 47-1.)  Barry Kratchman also testified that it was not a

condition of the deal for the masks to be on the EUA list. (Kratchman Dep. 222:9–18, Doc. 39-26.)

But 3South calls this fact "*HIGHLY* disputed[.]" (Doc. 47 at 4.)  To support this position, 3South points to evidence that it informed Coppolino and Delaware Valley that 3South needed to purchase FDA approved masks because the potential buyers were healthcare workers. (*See* Johnston Dep. 116:16–117:19, 118:16–23, 122:22–123:6, Doc. 47-1; Coppolino Dep. 44:6–45:24, Doc. 47-3.)  Further, when 3South issued the Purchase Order, it was told by Coppolino, who Johnston believed was acting as an agent of Delaware Valley, that Delaware Valley "had an FDA-authorized mask." (Johnston Dep. 17:18–18:4, Doc. 47-1; *see also* Coppolino Dep. 52:11–16, Doc. 47-3 (Q: "At some point did you find out that the masks that were being imported were not FDA or EUA approved?" A: "I thought they were FDA approved.  I know they were trying to get them EUA approved. That's my recollection.").

On April 28, Delaware Valley again confirmed to 3South that the masks were FDA-authorized. (Johnston Dep. 17:24–18:4, Doc. 47-1.)  Specifically, in an email dated April 28, 2020, from Kratchman to Johnston, Kratchman stated, "The manufacturer was issued an FDA Emergency Use Certificate and is registered on the FDA web site.  I believe China is protecting their ass but officially they are for industrial use, not medical." (Johnston Dep., Ex. P-2, Doc. 47-1 at 47.) Delaware Valley's owner, Barry Kratchman, "had called it an FDA authorized use mask[.]" (Johnson Dep. 23:14–20, Doc. 47-1.)  3South intended to sell the masks to its "healthcare agencies' hospitals; because the price point that Barry was selling at, and the fact that it was an FDA, EUA-authorized mask, made it perfect for healthcare, and hospitals, who were desperate for masks at the time." (*Id.* at 24:3–12.)  The "masks not being on the approved list" was "a deal changer" and "a big deal" to 3South because EUA approval and timely receipt of the masks were

6

"important" aspects of the agreement with Delaware Valley and "without EU certification, without being on the FDA list, there was no deal. . . ." (*Id.* at 31:6–11, 71:9–73:1.)

When Johnston "did the PO on the 25th, [she] was doing a PO for an FDA-authorized mask[.]" (*Id.* at 18:1–3; *see id.* at 113:15–20, 138:6–139:5.) She stated the terms "FDA" or "EUA" did not appear in the Purchase Order because that requirement was reflected in email correspondence and had been discussed by the parties via telephone on numerous occasions. (*Id.* at 9:9–19, 120:8–25, 122:22–123:6.) Johnston stated that she did not know that the KN95 mask that was being purchased was not on the EUA list at the time the purchase was made. (*Id.* at 13:24–14:5.)

### D. Arrival and Inspection

After advising 3South that the KN95 masks would arrive and 3south would have the opportunity to inspect, on May 11, 2020, Delaware Valley notified 3South that the KN95 masks had arrived and again asked when 3South would inspect the masks. (*SMF* ¶ 12, Doc. 39-2; *RSMF* ¶ 12, Doc. 47 at 5.) Despite several notices, 3south did not physically inspect and take possession of the masks. (Kratchman Dep. 148:4–15, Doc. 39-33; Johnston Dep. 9:3–8, Doc. 47-1.)

But 3South explains how, on April 30, 2020, when the masks purchased by Delaware Valley were not found on the FDA approval list, Ms. Johnston emailed Coppolino and Kratchman to alert them to the problem, and to set up a call for the next morning, and 3South informed Delaware Valley via the telephone call to Kratchman that it could not purchase non-FDA approved masks. (Johnson Dep. 14:16–20:15, 30:5–12, 35:5–12, 74:3–75:25, 78:16–80:20, 85:4–13, Doc. 47-1; *See also* Kratchman Dep., Ex. 10, Doc. 47-2 at 11 (email from Johnston to Coppolino setting up the call because she had "reached out to the plant to see what the difference is between the 9560K and 9570K which is on the approved list from FDA for KN95 masks" and stating, "We

need to understand why they didn't list the 9560K mask that we are buying.  We have gone through the documents but not finding the difference for our clients.").  Johnston also explained that it was "only when [she] started to hear rumblings that the FDA, and other people, were cracking down" did she investigate the representation that the masks were approved by calling and emailing the plant herself and checking their website, and that she "was made aware that it was not." (Johnston Dep. 74:3–11, 115:17–116:13, 124:11–125:3, Doc. 47-1.)

At that point, 3South advised Delaware Valley that it should not move forward with its purchase of the masks. (*Id.* at 79:1–6, 84:23–85:13, 129:7–24.) According to Johnston, Delaware Valley continued with its decision to import the non-FDA approved masks despite 3South's urging and knowing that 3South would not and could not accept non-FDA approved masks. (*Id.* at 84:23–85:13, 129:7–24.)

In response to 3South's notice that it could not accept non-FDA approved masks, on May 1, 2020, Delaware Valley represented to 3South that the masks would be approved "in the next week and a half." (*Id*. at 19:1–5, 19:16–20; *see also* Johnston Dep., Ex. P-3, Doc. 47-1 at 49 (stating in May 1, 2020, email from Kratchman to Johnston that, according to "Jason" at the plant, Jason expected EUA approval of the 9560K "next week or the week after that").)  Johnston responded that 3South would accept the masks "then." (Johnston Dep., Ex. P-3, Doc. 47-1 at 49.)  Johnston testified that "then" meant when they were on the EUA-approved list. (*See* Johnston Dep. 32:3–16, 33:23–34:18, 85:18–25, Doc. 47-1.)

The masks did not gain FDA approval and were not placed on the EUA list in the next week and a half or even within a month thereafter. (*Id.* at 75:22–25, 82:18–25.)  The masks in question did not gain FDA approval until September 2020. (*See* 3South's *Additional Material*

Facts ("*SAMF*") ¶ xxvii, Doc. 47 at 9; Delaware Valley's *Reply to* [*SAMF*] ("*RAMF*") ¶ 27, Doc. 50-1.)[3]

When asked about 3South's right to inspect, Johnston stated, "the problem is they weren't approved; they weren't on the FDA . . . . I wouldn't have flown out to inspect, and approve it, because they still weren't meeting the specs of the mask they, originally, proposed." (Johnson Dep. 68:12–70:13, Doc. 47-1.)  Johnston further stated, "the other condition was that a client and I had to fly out and inspect, and approve, it. But why would I fly out, or make a -- a client is not gonna' fly out -- if it's not FDA certified, like he put in his e-mail; that doesn't make any sense." (*Id.* at 75:11–16; *see also id.* at 129:18–24 ("But I said [to Barry]: I can't inspect, and approve, 'em, because they're not on the list'; so he went ahead and brought them in, anyway; because he had . . . invested the money on the freight."); 135:3–24 ("and by that point, we had already determined they weren't on the UA, the FDA had rescinded all factories; so it was never gonna' meet my inspect, or my client's inspection, and approval; . . . They weren't gonna' pay that amount for something that was not -- didn't meet the specs that they got.").

As of May 2 and 4, 2020, 3South had already conveyed to Delaware Valley that it would not accept the masks. (*See SAMF* ¶ xxx, Doc. 47 at 9; *RAMF* ¶ 30, Doc. 50-1.)  Ultimately, on May 4, 2020, Delaware Valley made final payments to its contacts in China for the shipment to be released. (*See SAMF* ¶ xxxi, Doc. 47 at 9; *RAMF* ¶ 31, Doc. 50-1.)

## II.  RULE 56 STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the

---

[3] When the *SAMF* and *RAMF* are cited together in this ruling, the fact was either admitted by Delaware Valley or qualified in such a way as to make the stated fact deemed admitted. *See* M.D. La. Civ. R. 56(f).

assertion by: [ ] citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (cleaned up). The non-mover's "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (cleaned up).

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion. Indeed, even if the moving party comes forward with an abundance of evidence supporting its theory of the case, the nonmoving party may nevertheless defeat the motion by countering with evidence of its own, which, if credited by the fact-finder, would entitle the nonmoving party to a verdict in its favor. Or, the non-moving party can defeat the motion by demonstrating that the evidence tendered by the moving party is itself laced with contradictions of [material] fact.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (cleaned up).

Also important here, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond

peradventure [(that is, beyond doubt)] *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986); *peradventure*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/peradventure (last visited Mar. 8, 2023). *See also Universal Sav. Ass'n v. McConnell*, 14 F.3d 52 (5th Cir. 1993) (unreported) ("Where the summary judgment movant bears the burden of proof at trial, the summary judgment evidence must affirmatively establish the movant's entitlement to prevail as a matter of law."). That is,

> In contrast, if the movant bears the burden of proof on a claim at trial, then its burden of production is greater. It must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing. If the movant fails to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response.

10A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2727.1 (4th ed. 2022).

## III.   Discussion

### A.  Parties' Arguments

Delaware Valley now seeks partial summary judgment on its breach of contract claim. (Doc. 39.) Plaintiff contends that the Purchase Order is clear and unambiguous and that, as a result, the Court cannot look to parol evidence to interpret the contract. (Doc. 39-1 at 6–8.) Alternatively, even if there was an ambiguity in the Purchase Order, that clause must be interpreted against 3South, which drafted the document. (*Id*. at 8–9.) Further, Delaware Valley maintains that, if the Purchase Order changed what type of good 3South intended to purchase, Delaware Valley would not have accepted that conditional term, so it cannot be made a part of the contract. (*Id.* at 9.) Ultimately, 3South was under an obligation to reject the nonconforming items within a reasonable time, and its failure to do so constitutes an acceptance that entitles Delaware Valley to payment

11

and damages. (*Id.* at 9–10.)  For all these reasons, Delaware Valley maintains that it is entitled to summary judgment on the breach of contract claim. (*Id.* at 11.)  Similarly, Plaintiff's *MIL* seeks a ruling barring the introduction of any evidence that varies the alleged clear and unambiguous terms of the Purchase Order. (*See* Doc. 67-1 at 3–6.)

3South vehemently opposes the motion. (Doc. 47.)  In sum, 3South maintains that it was only obligated to pay for FDA approved masks, and, since Delaware Valley failed to provide them, 3South was not required to pay. (*See, e.g.*, *id.* at 4–5.)  More specifically, 3South contends:

(1) there was no binding agreement between the parties, given (a) the fact that there was no agreement about the quality or quantity of masks requested, and (b) the lack of consent resulting from these errors, (*id.* at 14–17);

(2) Delaware Valley breached its agreement because:

(a) the Purchase Order was for FDA approved masks since (i) parol evidence is justified in situations involving ambiguous or indiscernible contracts and fraud, all of which are present here; (ii) parol evidence shows that the intent between the parties was for FDA approved masks; and (iii) the parties at least had an oral contract requiring FDA approved masks; and

(b) Delaware Valley breached the contract (i) by not providing non-confirming goods which 3South timely rejected; (ii) by 3South's refusal of the goods after inspection; and (iii) by the fact that inspection would have been a vain and useless act, (*id.* at 17–24); and

(3) the invoice was never accepted and is thus not a binding contract, (*id.* at 24–25).

In reply, Plaintiff states that 3South's position rests entirely on parol evidence, but the Court should instead focus on the clear and unambiguous language of the Purchase Order. (Doc. 50 at 4.)  After responding to 3South's additional material facts, (*id.* at 5–8), Delaware Valley asserts that 3South cannot add into the Purchase Order a provision which says that inspections are not required if they are vain and useless, (*id.* at 8–9.)  Plaintiff then reiterates that the Purchase Order is a binding contract. (*Id.* at 10).  Next, Delaware Valley asserts that (1) there was no error,

and 3South cannot alter the terms of the Purchase Order, and (2) 3South lacks the evidence to

show fraud, and, in any event, its position is inconsistent. (*Id.* at 10–12.)  Finally, Plaintiff did not

breach the Purchase Order; if the parties had agreed that Plaintiff would supply only FDA approved

masks, then that term would have been included in the Purchase Order. (*Id.* at 12–13.)

### B.  Applicable Law

#### *1. Louisiana Law Generally and Governing Sales in Particular*

"Louisiana law applies in this diversity case." *Jorge-Chavelas v. La. Farm Bureau Cas.*

*Ins. Co.*, 917 F.3d 847, 850 (5th Cir. 2019) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64

(1938)). "Our task is to determine as best we can how the Louisiana Supreme Court would

decide it." *Id.* (cleaned up). Because of Louisiana's civilian tradition, "Louisiana's 'Constitution,

codes, and statutes' are of paramount importance to its judges." *Id.* at 851 (quoting *Am. Int'l*

*Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003)).

> Unlike stare decisis, which can flow from one decision, in the civil
> system numerous court decisions must agree on a legal issue to
> establish *jurisprudence      constante* (French      for      constant
> jurisprudence). And even when that consensus exists in the caselaw,
> it remains only persuasive authority for the *Erie* guess; "we are not
> strictly bound" by the decisions of Louisiana's intermediate courts.

*Id.* (quoting *Am. Int'l Specialty Lines*, 352 F.3d at 261 (quoting *Transcon. Gas Pipe Line Corp. v.*

*Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992)); *see also* Alvin B. Rubin, *Hazards of a Civilian*

*Venturer in Federal Court: Travel and Travail on the Erie Railroad*, 48 LA. L. REV. 1369 (1988)

(cited with approval by *Jorge-Chavelas*).

"Sale is a contract whereby a person transfers ownership of a thing to another for a price

in money." La. Civ. Code art. 2439.  "The thing, the price, and the consent of the parties are

requirements for the perfection of a sale." *Id.  See also DB Orban Co. v. Lakco Pipe & Supply,*

*Inc.*, 496 So. 2d 1382, 1384 (La. App. 3 Cir. 1986) ("Three circumstances must concur for the

perfection of a contract of sale: the thing sold, the price, and the consent." (citing La. Civ. Code art. 2439)).  "A contract of sale requires that both parties intend the same thing." *Id.* (citing *Jacob Cohen & Son v. Friedman's Est.*, 13 La. App. 154, 127 So. 412 (La. App. 2 Cir. 1930)).

"The seller must deliver to the buyer things that conform to the contract." La. Civ. Code art. 2603.  "Things do not conform to the contract when they are different from those selected by the buyer or are of a kind, quality, or quantity different from the one agreed." *Id.*

"When the buyer has reserved the view or trial of the thing, ownership is not transferred from the seller to the buyer until the latter gives his approval of the thing." La. Civ. Code art. 2460. For sales of movables, "[t]he buyer has a right to have a reasonable opportunity to inspect the things, even after delivery, for the purpose of ascertaining whether they conform to the contract." La. Civ. Code art. 2604.  "A buyer may reject nonconforming things within a reasonable time." La. Civ. Code art. 2605. "The buyer must give reasonable notice to the seller to make the rejection effective." *Id.*  "A buyer's failure to make an effective rejection within a reasonable time shall be regarded as an acceptance of the things." *Id.*

### 2. Ambiguous Contracts: Interpretation, Use of Parol Evidence, and Summary Judgment

"Interpreting a contract is a matter of determining the parties' common intent." *Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 298 (5th Cir. 2019) (citing La. Civ. Code art. 2045). "When a contract is unambiguous, [courts] look only to the four corners of the contract to interpret it." *Id.* (citing La. Civ. Code art. 2046).  "A contract is ambiguous, however, 'when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction.' " *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007) (quoting *Lloyds of London v. Transcon. Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996)).

14

"[W]hen the terms of a written agreement are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity or to show the intention of the parties." *Brock Servs.*, 936 F.3d at 298 (citing *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 563 (5th Cir. 2005)). *See also Scafidi v. Johnson*, 420 So. 2d 1113, 1115 (La. 1982) ("Between the parties to an instrument, parol evidence is admissible . . . to explain an ambiguity when such explanation is not inconsistent with the written terms . . . ." (quotation omitted) (cited with approval by *Brock Servs.*)).

"A doubtful provision must be interpreted 'in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.' " *Greenwood 950, L.L.C. v. Chesapeake La., L.P.*, 683 F.3d 666, 669 (5th Cir. 2012) (quoting La. Civ. Code art. 2053). "According to the Civil Code, *equity* 'is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another,' and *usage* is 'a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation.' " *Id.* at 669 n.13 (quoting La. Civ. Code art. 2055).

Additionally, "[n]ontechnical words in a contract must be given their generally prevailing meaning, and each contract provision must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Id.* at 669 (citing La Civ Code arts. 2047, 2050).

"If an ambiguity remains after applying the other general rules of construction, then the ambiguous contractual provision is to be construed against the drafter." *Brock Servs.*, 936 F.3d at 298 (quoting *Chinook USA, L.L.C. v. Duck Commander, Inc.*, 721 F. App'x 361, 366 (5th Cir.

2018) (citing La. Civ. Code art. 2056 ("In case of doubt *that cannot otherwise be resolved*, a provision in a contract must be interpreted against the party who furnished its text." (emphasis added by *Brock Servs.*))). But, in the context of sales, "[t]he seller must clearly express the extent of his obligations arising from the contract, and any obscurity or ambiguity in that expression must be interpreted against the seller." La. Civ. Code art. 2474.

Ultimately, because "[i]ntent is an *issue of fact* which is to be inferred from all of the surrounding circumstances," *Guidry*, 512 F.3d at 181 (citations omitted), "when a contract is ambiguous, the trier of fact must resolve the factual issue of intent, and judgment on the pleadings or summary judgment is improper," *id.* (citing *Investors Syndicate of Am., Inc. v. City of Indian Rocks Beach*, 434 F.2d 871, 877–78 (5th Cir. 1970) (finding that dismissal on the pleadings was error when the contract at issue was ambiguous); *Gertler v. City of New Orleans*, 2003-2131 (La. App. 4 Cir. 9/1/04), 881 So. 2d 792, 796 ("If the language of [a contract] is ambiguous or susceptible to multiple interpretations, the intent of the parties must be determined and summary judgment is inappropriate.")); *see also Liberty Mut. Ins. Co. v. Pine Bluff Sand & Gravel Co*., 89 F.3d 243, 246 (5th Cir. 1996) ("[A]mbiguity in the terms of a contract gives rise to a fact question concerning the intent of the parties." (cited with approval by *Guidry*)). "Granting summary judgment on an ambiguous contract may be appropriate only in the very rare circumstance where 'there is no issue of material fact concerning the pertinent intent' of the parties." *Guidry*, 512 F.3d.at 181 n.5 (quoting *Sanders v. Ashland Oil, Inc.*, 96-1751 (La. App. 1 Cir. 6/20/97), 696 So. 2d 1031, 1035).

### 3. Vices of Consent: Error, Fraud, and Use of Parol Evidence

"A contract is null when the requirements for its formation have not been met." La. Civ. Code art. 2029. "Consent may be vitiated by error, fraud, or duress." La. Civ. Code art. 1948.

16

"Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." La. Civ. Code art. 1949. "Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation." La. Civ. Code art. 1950

"Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. Civ. Code art. 1953. "Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent." La. Civ. Code art. 1955. "Fraud committed by a third person vitiates the consent of a contracting party if the other party knew or should have known of the fraud." La. Civ. Code art. 1956.

"Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature." La. Civ. Code art. 1848. But, "under Louisiana law, testimonial (parol) evidence is clearly admissible to show error even where the contract language is clear and unambiguous." *Hymel v. UNC, Inc.*, 994 F.2d 260, 263 (5th Cir. 1993) (citing, *inter alia*, La. Civ. Code art. 1848 ("Testimonial or other evidence . . . may be admitted to prove such circumstances as a vice of consent. . . .") and *Daigle & Associates, Inc. v. Coleman*, 396 So. 2d 1270, 1271 (La. 1981) ("Under our longstanding jurisprudence parol evidence is admissible when there are allegations of fraud, error, or mistake, to show that the instrument is not the expression of the actual intention of the parties.")). *See also* La. Civ. Code art. 1848, comment

17

(b) ("Testimonial proof may be used against a writing to show error, fraud, or duress . . . ." (citations omitted)).

### C.  Analysis

Having carefully consider the matter, the Court will deny Plaintiff's motion.  In short, this case is rife with questions of fact that preclude summary judgment.

At the outset, the Court finds that the Purchase Order is not clear and unambiguous, so parol evidence can be used to ascertain the parties' intent.  More specifically, the thing to be sold is described as "KN95," and this term is susceptible to two different reasonable interpretations: masks that were FDA and EUA certified (3South's understanding), and masks that were not (Delaware Valley's). (*See SMF* ¶ 8, Doc. 39-2; *RSMF* ¶ 8, Doc. 47 at 4; *see also* Johnston Dep. 74:3–11, 115:17–116:13, 124:11–125:3, Doc. 47-1 (realizing difference only after digging into the matter).)

Additionally, the Purchase Order also stated, "PAYMENT will be made after inspection and approval of mask deliveries." (*See SMF* ¶ 9, Doc. 39-2; *RSMF* ¶ 9, Doc. 47 at 4.)  Reasonable persons could differ on what the terms "inspection" and "approval" convey.  Does that phrase mean "inspection and approval" solely to evaluate whether the masks were damaged or merely KN95 masks, or does it also encompass Defendant's right to reject the items if they were not FDA and EUA-certified or if they were otherwise unable to be used by medical providers?  Moreover, does "inspect" require a physical, on-site inspection, or was a constructive inspection made by Defendant, after learning that the masks were not FDA and EUA certified, sufficient?

Again, "[a] contract is ambiguous . . . when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying

established rules of construction." *Guidry*, 512 F.2d at 181 (citation omitted).  All of the above interpretations of the Purchase Order are reasonable, so the contract is ambiguous.

Further, "when the terms of a written agreement are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity or to show the intention of the parties." *Brock Servs.*, 936 F.3d at 298 (citation omitted). Thus, the Court must look at the facts—including "the conduct of the parties before and after the formation of the contract," *Greenwood 950*, 683 F.3d at 669, and "all of the surrounding circumstances," *Guidry*, 512 F.3d at 181—to ascertain the parties' intent.

Once extrinsic evidence can be examined, a reasonable juror could easily find in favor of 3South, particularly when construing the evidence in a light most favorable to 3South and drawing reasonable inferences in its favor (which the Court must do for purposes of the instant motion). That is, a reasonable juror could, without difficulty, conclude that the intent behind the contract was to provide FDA-approved and EUA-certified masks, that Delaware Valley breached the terms of the sale by failing to provide the correct goods, and that 3South was under no obligation to pay for the non-conforming items. This is clear from the totality of the circumstances, including but not limited to:

(1) Coppolino and Kratchman telling Johnston that the masks were on the FDA list numerous times before the sale, (Johnston Dep. 9:9–19, 13:15–19:5, 120:8–25, 122:22–123:6, Doc. 47-1);

(2) Johnston telling Coppolino and Kratchman that 3South needed to purchase FDA approved masks because the potential buyers were healthcare workers, (*see* Johnston Dep. 116:16–117:19, 118:16–23, Doc. 47-1; Coppolino Dep. 44:6–45:24, Doc. 47-3);

(3) Coppolino telling Johnston that Delaware Valley "had an FDA-authorized mask" when 3South issued the Purchase Order, (Johnston Dep. 17:18–18:4, Doc. 47-1; *see also* Coppolino Dep., 52:11–16, Doc. 47-3);

(4) Johnston telling Coppolino that 3South was "not taking the risk" in the mask purchase, and Coppolino telling her, "if they're not good, then you don't have to get 'em," (Johnston Dep. 94:14–21, Doc. 47-1);

(5) Kratchman telling Johnston in the April 28, 2020, email that "[t]he manufacturer was issued an FDA Emergency Use Certificate and is registered on the FDA web site," (Johnston Dep., Ex. P-2, Doc. 47-1 at 47);

(6) Kratchman calling "it an FDA-authorized use mask," (Johnson Dep. 23:14–20, Doc. 47-1); and

(7) Johnston testifying that 3South would not have purchased the masks at that price point without FDA and EUA approval, (Johnston Dep. 24:3–12, 31:6–11, 72:9–73:1, Doc. 47-1).

Again, "when a contract is ambiguous, the trier of fact must resolve the factual issue of intent, and judgment on the pleadings or summary judgment is improper." *Guidry*, 512 F.3d at 181 (numerous citations quoted above omitted). For this reason alone, summary judgment is inappropriate.

Delaware Valley objects that the Purchase Order must be construed against 3South since 3South drafted it, but this misses the mark for two reasons. First, again, in the context of sales, "[t]he seller must clearly express the extent of his obligations arising from the contract, and any obscurity or ambiguity in that expression must be interpreted against the *seller*." La. Civ. Code art. 2474 (emphasis added). Here, Delaware Valley is the seller, not 3South, so the Court must construe ambiguities against Delaware Valley. Second, and even more importantly, while it is true that ambiguities are construed against the party that drafted an agreement, *Brock Servs.,* 936 F.3d at 298, such a method of interpretation is employed only "[i]f an ambiguity remains after applying the other general rules of construction," *id.* (citation omitted), or "[i]n case of doubt *that cannot otherwise be resolved . . .,*" *id.* (quoting La. Civ. Code art. 2056). Here, a reasonable juror could resolve the ambiguities in favor of 3South, without resorting to this method of interpretation.

Delaware Valley also complains that 3South's failure to inspect the goods constitutes acceptance under Article 2605, but the Court rejects that argument as well. As stated above, a

reasonable interpretation of the Purchase Order—particularly in light of the state of the world at the beginning of the pandemic—is that 3South did not need to make a physical inspection of the masks when Johnston knew that the masks were not FDA or EUA compliant. (*See* Johnson Dep. 68:12–70:13, 75:11–16, 119:14–120:25, 135:3–24, Doc. 47-1.)  This is particularly true given the fact that "[t]he law does not require the doing of a vain and useless thing." *Bd. of Sup'rs of La. State Univ. v. Fleming*, 265 F.2d 736, 738 (5th Cir. 1959); *see also Meunier v. Liang*, 521 So. 2d 475, 476 (La. App. 4 Cir. 1988) ("when one contracting party has announced that he will not honor his agreement, the other party is not required to tender performance since to do so would be vain and useless." (citations omitted)); *Burk Dev. Co., Inc. v. Guillory*, 335 So. 2d 512, 513 (La. App. 1 Cir. 1976) (finding that plaintiff did not need to demand performance from defendant when defendant informed plaintiff he could not perform because "any demand . . . would be for purposes of formality alone and would serve no useful purpose" and "[t]he law does not require vain and useless acts from a party.").  Thus, given 3South's knowledge about the condition of the masks, a physical inspection of same was not required by the agreement or by the law.

Further, even if all jurors would find that the Purchase Order allowed for non-FDA approved masks, a reasonable juror could easily conclude that 3South's consent was vitiated by, at the very least, error.  Again, the evidence detailed above (all of which can be considered, *see Hymel*, 994 F.2d at 263; La. Civ. Code art. 1848) demonstrates that an essential cause for the contract for 3South was that Delaware Valley would supply FDA and EUA certified masks, that 3South would not have entered into the agreement without that type of mask, that Delaware Valley knew this, and that thus there was an error about the object of the contract.[4] *See* La. Civ. Code arts. 1949, 1950.

---

[4] The Court need not resolve whether 3South has also established fraud, though there is certainly evidence of that in the record from the facts highlighted above.

Phrased another way, "[t]hree circumstances must concur for the perfection of a contract of sale," one of which is the "thing sold." *DB Orban*, 496 So. 2d at 1384 (citing La. Civ. Code art. 2439. "A contract of sale requires that both parties intend the same thing." *Id.* (citation omitted). Here, a reasonable juror could find that the parties had no agreement about the quality of the thing sold and that thus there was no perfected sale. *See id.* at 1385 ("The record also reflects a disagreement between the parties concerning what quality pipe was intended to be sold and purchased, J–55 pipe or the lighter grade A–53, or both. . . . Considering all the circumstances, we can find no clear error in the trial court's conclusion that there was no meeting of the minds and therefore no contract between the parties."). For this additional reason, summary judgment must be denied.

In closing, the Court notes two things. First, Delaware Valley disputes much of 3South's position, including (a) the extent to which Coppolino had the authority to act on behalf of Delaware Valley, (*see RAMF* ¶ 3, Doc. 50-1), his precise relationship with Delaware Valley, (*id.* ¶ 5), and what exactly he communicated to 3South regarding the risks each side bore, (*id.* ¶¶ 7–8, 16); (b) the extent to which Kratchman communicated with Johnston over the telephone, (*id.* ¶¶ 4, 18); (c) the extent to which Johnston communicated to Delaware Valley about to whom 3South intended to sell the masks, (*see id.* ¶ 9); (d) whether Coppolino or Kratchman ever represented to 3South that the masks would be FDA and EUA-authorized, (*id.* ¶¶ 10–11, 15, 18, 20–21); (e) whether FDA-compliance was ever a part of the agreement, since it was not written expressly in the Purchase Order, (*id.* ¶¶ 12–14, 17, 19–21, 27–28, 30, 33–34); (f) whether the Purchase Order could be varied or modified by any post-Purchase Order statements, (*id.* ¶ 22); (g) whether Johnston ever told Kratchman not to proceed with the mask order, (*id.* ¶¶ 23–24, 31), or that she would delay acceptance until approval, (*id.* ¶ 26); and (h) whether Kratchman told 3South that the masks would

be approved "in the next week and a half," (*id.* ¶ 25).  All of the evidence referenced in these paragraphs (which this Court has reviewed in detail) simply highlights the fact that this case is replete with questions of material fact that preclude summary judgment.

Second, given the Court's finding that the Purchase Order is ambiguous, Delaware Valley's *MIL* must also be denied.  In short, parol evidence can be used to interpret the language of the Purchase Order and to assess whether error or fraud vitiated 3South's consent to the agreement.

IV.    **CONCLUSION**

Accordingly,

**IT IS ORDERED** that the *Motion for Partial Summary Judgment* (Doc. 39) and the *Motion in Limine to Preclude Parol Evidence* (Doc. 67) filed by Plaintiff, Delaware Valley Fish Company, are **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>March 8, 2023</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**